# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MELISSA CUMMINGS,**
**o/b/o CAROL K. CAMPBELL, Deceased,**

**Plaintiff,**

*vs.*                                                    **Civil Action No.  5:05CV109**
                                                          **(Judge Frederick P.  Stamp, Jr.)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Carol K. Campbell brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to

obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and

sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security

Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.[1]  The matter is awaiting decision on cross motions

for summary judgment and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b); Standing Order No.6.

## I.  Procedural History

Carol K. Campbell ("Plaintiff") filed an application for DIB on May 30, 2000, and for SSI

on December 27, 2000, alleging disability since December 17, 1999, due to neck, shoulder, arm, and

back pain; arthritis; severe headache; disc degeneration; right hand problems; and inability to deal

---

[1]Carol K. Campbell, Plaintiff, was killed in an automobile accident on August 6, 2005
[Docket Entry 7].  By order of this Court, her daughter, Melissa Cummings, was permitted to
substitute for Plaintiff as a party to this action [Docket Entry 8].

with the public. (R. 69-71, 98-107, 120-22, 521-24). The State agency denied Plaintiff's application initially and on reconsideration (R. 47, 48, 56, 525). Plaintiff requested a hearing, which Administrative Law Judge Steven Slahta ("ALJ") held on March 21, 2002, in Bridgeport, West Virginia, and at which Plaintiff, represented by counsel, and Eugene Czuczman, a vocational expert ("VE") testified (R. 554-612). On May 15, 2002, the ALJ entered a decision finding Plaintiff was not disabled within the meaning of the Act (R. 24-34). On February 14, 2003, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 15-16).

## II. Statement of Facts

Plaintiff was born on October 19, 1953, and was forty-nine years old at the time of the administrative hearing (R. 69). Plaintiff graduated from high school, and her past-relevant work included that of an optician lab tech and office manager (R. 100, 105, 108).

On December 5, 1987, Plaintiff had a CT scan of her lumbar spine. It showed a small, localized L5-S1 disc protrusion at L5 on the right (R. 170).

On January 4, 1988, Alfredo C. Velasquez, M.D., corresponded with Dr. John Foundas. He evaluated Plaintiff based on her complaints relative to an injury to her lumbar spine that she had sustained at work on October 30, 1987 (R. 189-90). Plaintiff informed Dr. Velasquez that her pain radiated to her right hip and leg, coughing and/or sneezing made the pain worse, and she had numbness in the right leg. He reviewed the December 1987 CT scan. Dr. Velasquez recommended Plaintiff be treated at the South Charleston Community Hospital (R. 189).

On March 4, 1988, Dr. Foundas examined Plaintiff's back and diagnosed a "severe lumbosacral sprain with a T4 syndrome, T8 to T12, on the right side" (R. 171).

On March 10, 1988, Ivan Mejia, M.D., provided a facet block at L-1 on the right to Plaintiff. It was noted Plaintiff was pleased with the therapy (R. 176).

On March 11, 1988, Plaintiff returned to Dr. Mejia, who noted Plaintiff's pain was relieved or "beginning to be relieved" by bed rest. Plaintiff reported sleeping more. Dr. Mejia provided facet blocks at L4-L5 to Plaintiff (R. 177).

On March 15, 1988, Dr. Foundas wrote to the State Worker's Compensation Fund ("Worker's Comp.") and informed it that Plaintiff's myelogram, as interpreted by Dr. Velasquez, was negative. He requested that Plaintiff be permitted to seek treatment at the South Charleston Community Hospital Pain Clinic (R. 175).

On March 21, 1988, Dr. Velasquez corresponded with Worker's Comp., informing it that Plaintiff's March 2, 1988 myelogram was normal. He stated that Plaintiff had slight tenderness at the L4-5 area of her spine, and her straight leg raising test was thirty to fifty degrees on the right and fifty to sixty degrees on the left. Plaintiff's pin prick sensation was diminished. Dr. Velasquez opined Plaintiff should continue with therapy (R. 190).

On March 25, 1988, Plaintiff reported to Dr. Mejia that she was "very dissatisfied with the therapy" (R. 178).

On April 1, 1988, Plaintiff reported to Dr. Mejia that her progress was "better" (R. 179).

On April 28, 1988, Dr. Velasquez performed a L5-S1 lumbar laminectomy on Plaintiff (R. 195).

On May 23, 1988, Dr. Velasquez noted Plaintiff experienced tenderness at the lumbar laminectomy incision, but the scar was well-healed. Her straight leg raising test was sixty to eighty degrees bilaterally. Her sensation to pinprick was intact. Dr. Velasquez prescribed Talwin and

3

Flexeril (R. 194).

On June 23, 1988, Plaintiff presented to Dr. Velasquez with complaints of continued lumbar pain with radiation to legs. Her straight leg raising test was thirty to sixty degrees bilaterally and her sensation to pinprick was diminished on the right. Dr. Velasquez prescribed Norflex and Tylenol III (R. 194).

On July 25, 1988, Plaintiff returned to Dr. Velasquez with complaints of lumbar pain. Her straight leg raising test was forty to eighty degrees bilaterally and her sensation to pinprick was diminished. Dr. Velasquez prescribed Norflex and Vicodin to Plaintiff (R. 194).

On August 25, 1988, Plaintiff presented to Dr. Velasquez with complaints of lumbar pain. Her straight leg raising test was seventy to eighty degrees bilaterally and her sensation to pinprick was slightly diminished. Her bending was slightly diminished. Dr. Velasquez prescribed Esgic. He discussed her returning to work, but Plaintiff stated she did "not think that she [could] do the work" and "there [was] a chance that next month she [would] be recommended for" permanent partial disability (R. 194).

On October 6, 1988, Plaintiff presented to Dr. Velasquez with complaints of continued pain. Her straight leg raising test was seventy to eighty degrees bilaterally and her sensation to pinprick was intact. Her bending was slightly limited. Plaintiff informed Dr. Velasquez she "[did] not think she [could] do her job that she used to do before" (R. 193).

On November 3, 1988, Plaintiff was evaluated by Joseph Saldanha, M.D. He opined Plaintiff was "recovering fairly well with residual low back pain as expected" from the lumbar laminectomy. Plaintiff's x-rays showed no "complicating features" (R. 181).

On December 19, 1988, a CT scan of Plaintiff's lumbar spine revealed "recurrent disc

4

material on the right side" at the L5-S1 level (R. 210).

On March 30, 1989, Dr. Saldanha examined Plaintiff. In a letter to Workers' Comp. dated May 2, 1989, Dr. Saldanha noted Plaintiff had done well after the lumbar laminectomy, but had developed "chronic low back syndrome and occasional episodes of right leg pain." Plaintiff stated she was in constant pain. Dr. Saldanha's review of Plaintiff's CT scan confirmed a "recurrent disc herniation at the L-5, S-1 level on the right." Dr. Saldanha opined Plaintiff should be evaluated and managed by a pain clinic and possible "repeat" surgery (R. 180).

On August 2, 1989, Plaintiff was examined by Dr. Velasquez, who reported to Worker's Comp. that Plaintiff's straight leg raising test was thirty to fifty degrees bilaterally and her sensation to pinprick was diminished on the left. He requested approval for a second opinion or admission of Plaintiff to the hospital for a myelogram and possible surgery (R. 198).

On September 11, 1989, a lumbar myelogram of Plaintiff revealed "asymetric filling of L-5 nerve root on left side" and "no extra-dupal defects seen" (R. 200).

Plaintiff was admitted to the hospital on September 11, 1989, with a diagnosis of herniated disc between L5 and S1 (R. 201).

On September 14, 1989, Dr. Velasquez performed a second L5-S1 lumbar laminectomy of Plaintiff (R. 202).

On October 18, 1989, Plaintiff presented to Dr. Velasquez and reported the "pain in the back was gone." Upon examination, Plaintiff's straight leg raising test was thirty to sixty degrees bilateral and her sensation to pinprick was intact. Dr. Velasquez prescribed Flexeril (R. 203).

On November 11, 1989, Plaintiff informed Dr. Velasquez that "alot [sic] of the pain she was having in her back has been relieved by the surgery." Dr. Velasquez prescribed Lortab and Flexeril

(R. 204).

On January 18, 1990, Dr. Velasquez reported Plaintiff had pain in her lumbar spine. Her straight leg raising test was thirty degrees left and sixty degrees right. He prescribed Talwin (R. 205).

On January 31, 1990, Plaintiff was examined by Ralph A. Stalnaker, M.D., at the request of J. Robert Weaver, Plaintiff's lawyer. Dr. Stalnaker observed no motor deficit, but noted a slight left limp. Plaintiff's Patellar and Achilles reflexes were present and symmetrical, her plantar reflexes were intact, her straight leg raising test was sixty degrees bilaterally, and Plaintiff's pinprick sensation was intact bilaterally (R. 183). Dr. Stalnaker found Plaintiff had a fourteen percent whole-person permanent, partial disability rating because of her restricted range of motion and her "intervertebral disc lesion with residual" (R. 184).

On February 19, 1990, Plaintiff returned to Dr. Velasquez with reports of continued lumbar pain (R. 206).

A March 12, 1990 x-ray of Plaintiff's "pelvis lumbar" showed a normal lumbar spine (R. 307).

On March 15, 1990, Plaintiff was examined by A. A. Abplanalp, M.D., for Worker's Comp. Dr. Abplanalp interviewed Plaintiff relative to her treatment history, examined Plaintiff, and reviewed her x-rays. He diagnosed "status post laminectomy, times two, for ruptured IV disc L-5 S-1 right, and recurrent herniated disc L-5 S-1 right" (R. 299-302). Dr. Abplanalp opined Plaintiff "continue[d] to be temporarily and totally disabled," required additional medical treatment, was not "ready to be rated for permanent partial disability," and any opinion relative to her rating for permanent partial disability should be deferred for one-hundred-twenty days (R. 302-03).

On March 26, 1990, Dr. Velasquez examined Plaintiff and noted her straight leg raising test

was thirty to fifty degrees on the left and sixty to seventy degrees on the right. He referred Plaintiff to "Vocational Rehabilitation for light duty training" (R. 207).

Plaintiff was examined by Dr. Velasquez on May 8, 1990 for lumbar pain. He prescribed Meclomen and Lortab. Her straight leg raising test was unchanged from the March 26, 1990, examination (R. 208).

On June 6, 1990, Dr. Velaszuez noted Plaintiff complained of lumbar pain. He prescribed Darvon (R. 209).

On July 20, 1990, Lori Jo Magana, Registered Physical Therapist with the Industrial Rehabilitation Center, Inc., reported Plaintiff was "moving better and performing more activities," but she still experienced pain (R. 186). P.T. Magana opined Plaintiff had reached her maximum improvement and should continue to make improvements to her limited range of motion if she continued with her home exercise plan (R. 187).

On July 30, 1990, Dr. Velasquez's examination of Plaintiff revealed her straight leg raising was eighty degrees bilaterally. Her sensation to pinprick was slightly diminished. Bending was slightly diminished, but her dorsiflexion and extension of her feet were normal. Plaintiff informed Dr. Velasquez she still experienced lumbar pain. Dr. Velasquez released Plaintiff to return to work on August 1, 1990 (R. 192).

On October 13, 1990, Plaintiff's Worker's Comp. case was closed because Plaintiff had been "successfully rehabilitated" and had returned to her "job . . . for more than 60 days now without any significant difficulties" (R. 271).

Plaintiff was again examined by Dr. Abplanalp for Worker's Comp. on December 3, 1990 (R. 304). He diagnosed status post laminectomy (two) for ruptured discs and chronic low back

7

syndrome. Dr. Abplanalp opined Plaintiff did not require additional treatment, Plaintiff had reached maximum degree of improvement, Plaintiff was not temporarily totally disabled at the time of the examination, and Plaintiff's permanent partial disability was twenty-one percent (R. 306).

On March 27, 1991, Plaintiff underwent a Psychological Evaluation by W. Joseph Wyatt, Ph.D. Plaintiff informed Dr. Wyatt that her pain continued and had worsened. She was working at "Dr. Rashid's" office, and she reported "constant harassment or mistreatment by the manager" there (R. 309). Plaintiff informed Dr. Wyatt she experienced additional stress because of "ongoing litigation, hearings, examinations, and the like and what she feels is undue skepticism by Dr. Rashid and/or his manager," who, according to Plaintiff, had her "followed and photographed by a private investigator." Plaintiff complained of frequent depression, frequent crying spells, "some suicidal ideas," difficulty sleeping, and back pain. Plaintiff stated she had been taking a daily dose of Triavil for her depression, which was prescribed by her family doctor, and she took Valium, which she "obtained from a friend" (R. 310).

Dr. Wyatt found Plaintiff's judgment and insight were good. He opined Plaintiff had no psychosis, delusions, hallucinations, or bizarre thoughts. Dr. Wyatt found Plaintiff was not psychotic. He estimated her intelligence to be in the average range (R. 311). Dr. Wyatt diagnosed the following: Axis I – dysthymia; Axis II – no diagnosis; Axis III – medical problems; Axis IV – stressors were moderate to severe; and Axis V – present GAF was fifty five and highest GAF in the past year was sixty. Dr. Wyatt found Plaintiff was twenty-five percent permanently partially disabled and her prognosis was fair to poor (R. 312).

On January 10, 1992, Charles C. Weise, M.D., completed a psychiatric evaluation of Plaintiff (R. 313). He noted Plaintiff returned to work in June 1990, and continued to work as of the date of

8

the report. Plaintiff did not "admit to any work related problems" when asked by Dr. Weise about stressors. Plaintiff informed Dr. Weise she was taking Elavil for her depression. Plaintiff stated she had drunk about "1/2 of a fifth of Bourbon" per day after her back injury, but she denied a current alcohol abuse. She smoked one package of cigarettes per day (R. 314). Plaintiff stated she was "unhappy," felt frustrated and irritable, and was a chronic worrier. Plaintiff was pessimistic, but was not suicidal. Plaintiff stated that after she returned home from work, she "[sat] down to relax," her ex-husband prepared meals, she and her ex-husband shared laundry duty, and she and her ex-husband shared the tasks of grocery shopping, washing dishes, and cleaning the house. Plaintiff stated she had a "loss of interest in relationship to sexuality;" however, Plaintiff engaged in "sexual relations three or four times a week because of her ex-husband's needs." Plaintiff informed Dr. Weise she occasionally visited her mother, she ate out in restaurants "a couple times a month," and she received few visitors at her home (R. 315).

Dr. Weise observed Plaintiff to be obese. He noted she was observed getting out of the vehicle for the appointment and "had no problems with her gait;" however, Plaintiff walked with a slight limp at the conclusion of the examination. Dr. Weise noted Plaintiff was vague about the past; was not shaky, sweaty, or overtly anxious; had no diagnosable generalized anxiety or panic disorder; had no signs or symptoms that equaled the criteria for major depression; had no thought disorder; and had no organic brain disorder.

Plaintiff's Full Scale IQ was 95, her Verbal IQ was 97, and her Performance IQ was 93 (R. 319). Dr. Weise opined Plaintiff's test scores indicated she functioned at the low average intellectual level and her reading level was above twelfth grade. He noted that Plaintiff's "MMPI2 evaluation was invalid because [Plaintiff] responded to the test in an exaggerated fashion claiming symptoms

and attitudes, which do not correspond to known psychiatric conditions." Dr. Weise found Plaintiff's "subjective complaints exceeded out weighted [sic] objective findings." Dr. Weise opined Plaintiff exaggerated her symptoms and did not have a psychiatric impairment (R. 316).

On February 10, 1992, Pablo M. Pauig, M.D., completed a psychiatric evaluation of Plaintiff upon referral by her lawyer (R. 321). Plaintiff informed Dr. Pauig that she had returned to work, but had been experiencing pain in her back with radiation to both legs. Plaintiff stated she had gained weight because she ate more due to her depression, she became easily aggravated, and she "[did not] like herself." Plaintiff informed Dr. Pauig she experienced nightmares and her interest in "doing anything" was "markedly diminished." Plaintiff asserted she experienced loss of concentration and anxiety. Dr. Pauig opined Plaintiff had a fifteen percent partial permanent psychiatric disability due to her depression and anxiety (R. 322).

On February 28, 1992, Plaintiff underwent a psychiatric evaluation, which was completed by Philip B. Robertson, M.D., upon referral of her lawyer. Plaintiff informed Dr. Robertson that she was experiencing conflicts at her job, at which she felt paranoid, harassed, tormented, on guard, and insecure. Plaintiff stated she experienced crying episodes, difficulty sleeping, increased appetite, impaired concentration, impaired self esteem, irritability, and moodiness. Plaintiff informed Dr. Robertson she felt "chronically depressed" (R. 323). Dr. Robertson's clinical findings and results of mental examination were as follows: Plaintiff 1) was alert; 2) was overweight; 3) had subdued and depressed demeanor; 4) was in no acute distress; 5) was withdrawn and avoided eye contact; 6) demonstrated a moderately depressed mood; 7) had average intellectual functioning; 8) had current, logical, and goal-directed thoughts; 9) presented no psychotic symptoms; 10) experienced lapses in her train of thought; 11) had fair judgment; and 12) had fair abstracting ability. Dr. Robertson found

the following: Axis I – dysthymia, chronic, moderately severe; Axis II – possible paranoid personality traits; Axis III – chronic pain secondary to compensable back injury, "status post lumbar diskectomy x 2," and history of nephrolithiasis. Dr. Robertson found Plaintiff had a ten percent permanent partial disability and that her depression had not been properly treated. He dispensed Pamelor to Plaintiff and recommended psychotherapy and pain management (R. 325).

On August 11, 1992, Plaintiff underwent a psychological evaluation by Rosemary Smith, a psychologist with the Charleston Psychiatric Group (R. 330). Plaintiff's full scale IQ was in the average range of intellectual functioning (R. 331). Ms. Smith opined the test results revealed there was a "strong indication[] of an anxiety condition" and "a depressive condition." Ms. Smith noted Plaintiff reported a "number of somatic complaints," which suggested the "possibility that these complaints are exaggerated or stress related rather than purely the result of physical health problems" (R. 335). Ms. Smith noted the following "[d]iagnostic [p]ossibilities": Axis I – generalized anxiety disorder, anxiety disorder "NOS," adjustment disorder with anxious mood, dysthymia disorder, and depressive disorder "NOS"; Axis II – schizoid personality disorder and compulsive personality disorder. Ms. Smith opined Plaintiff was moderately depressed and her "self-reported anxiety" was in the "marked range" (R. 337).

Ralph S. Smith, Jr., a psychiatrist with the Charleston Psychiatric Group, evaluated Plaintiff on September 16, 1992 (R. 326). Plaintiff informed Dr. Smith that she experienced pain in her back and legs. Plaintiff stated she had changed jobs because she experienced harassment at her previous place of employment. Plaintiff informed Dr. Smith that her "first [operation] marginally helped [her condition] and the second [operation] helped more." Plaintiff, when asked about her mental symptoms, stated she was "'doing better now than I was'" (R. 326). Plaintiff stated she avoided

11

people, she had difficulty concentrating, her mood was "'a little better, still kind of depressed and aggravated easily," she had normal sexual activity, she had gained weight, she cried easily, she had difficulty sleeping and diminished energy, and she was paranoid (R. 326-27). Dr. Smith found Plaintiff was alert, her mood was muted, her affect was appropriate, she was fully oriented, her recent memory was poor, her remote memory was adequate, her attention was good, her common sense knowledge was good, and her social judgment was adequate (R. 328). Dr. Smith's diagnoses were as follows: Axis I – dysthymia; Axis II – avoidant and schizoid personality traits; Axis III – lumbar syndrome; and Axis IV – psychosocial stressors, chronic pain, severe and moderate. Dr. Smith found Plaintiff had a five percent permanent partial disability and appeared stabilized (R. 329).

On May 20, 1993, Plaintiff underwent a psychiatric consultation and psychological testing by Robert C. Ovington, M.D. (R. 339). Plaintiff informed Dr. Ovington that she medicated her pain with Feldene and Tylenol #4. She stated her appetite was fair and she had lost weight. She said she had "allowed her weight to get up to 173 pounds, but currently has it down to 148 pounds." Plaintiff stated she retired between 11:30 p.m. and 2:00 a.m. and rose at 6:00 a.m. Plaintiff smoked one package of cigarettes per day (R. 345). Plaintiff stated that she had drunk a half a fifth of whiskey per day, but had "curtailed her drinking to one or two drinks a month" (R. 345-46). Plaintiff informed Dr. Ovington that she was twice divorced, the second divorce occurring as a result of her husband shooting a gun at her. Plaintiff stated she currently lived with her first ex-husband (R. 346).

Dr. Ovington noted Plaintiff's results on the Bender-Gestalt and Memory for Designs revealed "no signs suggestive of organicity." Plaintiff's Verbal IQ was scored at 99; Performance IQ was scored at 102; and Full Scale IQ was scored at 100, which placed Plaintiff in the "exact

12

middle of the 'Average' range of intellectual functioning" (R. 346). Plaintiff scored the following on the WRAT-R: reading was above twelfth grade; arithmetic was scored at the seventh grade (R. 346-47).

Dr. Ovington observed Plaintiff was well oriented, alert, and cooperative. Her eye contact was poor; her speech was spontaneous, relevant, and coherent; she was guarded and evasive; her reality testing was not grossly impaired; her intellectual functioning was average; she was not anxious; she was "questionably mildly depressed;" and was anhedonic (R. 347). Plaintiff listed her activities of daily living as follows: Plaintiff worked "regularly as the manager and also an optician at Greyfields Optical . . . receiving $1,200.00 every two weeks" in compensation; her work environment was "happier" than her previous work environment; she experienced difficulty "maintain[ing] a pleasant demeanor with the customers" at her place of employment; Plaintiff was paying for the trailer in which she and her ex-husband resided; she did most of the cooking; her daughter did the laundry; she camped once or twice per year; and she watched television and read (R. 347-48). Plaintiff stated she belonged to no church, clubs, or organizations. Plaintiff denied being bored (R. 348).

Dr. Ovington diagnosed dysthymia, chronic, currently very mild, precipitated in part by Plaintiff's October 1987 injury. Dr. Ovington opined psychiatric treatment would not alter Plaintiff's "very mild dysthymia." He found Plaintiff had reached the "maximum degree of improvement from a psychiatric standpoint" and had a two percent permanent partial disability (R. 349).

On March 10, 2000, Plaintiff was examined at Family Health Care by Physician Assistant Brian Baker. Plaintiff was positive for intermittent lung wheezes. PA-C Baker prescribed Ceftin,

Serevent, Claritin, Proventil and Effexor to Plaintiff (R. 441-42).

A March 13, 2000, chest x-ray showed "no focal infiltrate" of the lungs. Plaintiff's pulmonary vascularity was normal and she had no pleural effusions (R. 355).

A March 13, 2000, x-ray of the cervical spine was also normal (R. 354).

On April 6, 2000, Plaintiff returned to PA-C Baker for a follow up examination and refills of her medications. Plaintiff reported "significant muscle discomfort" in her "upper thoracic/lower C-spine area" due to lifting her mother. (Emphasis added). PA-C Baker diagnosed depression due to psychosocial stressors. He prescribed Relafen, Fiorcet, Bactrim, Maxir, Proventil, and Paxil. PA-C Baker also provided eight trigger point injections of DepoMedrol to Plaintiff in her trapezius/rhomboid area (R. 440).

On April 10, 2000, Plaintiff reported to Dr. Seen that the trigger point injections did not alleviate her pain and requested a muscle relaxant. He prescribed Skelaxin (R. 439).

On April 11, 2000, Plaintiff underwent an MRI of her cervical spine. It revealed a "palpable mass right posterior occipital region" that appeared to "correspond to a 2.5 cm lipoma within the subcutaneous tissues" (R. 478).

Plaintiff returned to Family Health Care on May 8, 2000, with complaints of leg pain, asthma and allergy symptoms, and poor sleep. PA-C Baker diagnosed "C-spine lipoma with radicular type pain" and "situational depression." He prescribed DepoMedrol, Benadryl, Zoloft, Talwin, and Tegretol. He recommended Plaintiff treat her allergies with either Zyrtec or Allegra and he provided samples of Nasonex and Flonase to Plaintiff. PA-C Baker informed Plaintiff that "lipoma need[ed] to be removed" by a neurosurgeon (R. 438).

On May 22, 2000, Plaintiff reported to PA-C Baker that she experienced "some ongoing

pain" that was "fairly bothersome" and "[s]ome fatigue." Plaintiff stated the Tegretol improved the "areas tingly in the upper extremities;" she was unsure if Talwin was "of any help or not;" Relafen "seem[ed] to help" her headaches "pretty well;" and Proventil improved her breathing. Plaintiff declined PA-C Baker's offer to refer her to a neurosurgeon due to the cost. Upon examination, PA-C Baker noted expiratory wheezes, trapezius spasm, and tenderness in the cervical spine area. He increased Plaintiff's dosage of Tegretol and prescribed Talwin, Proventil, Elavil, and Zoloft. He provided samples of Claritin and Relafen (R. 437).

On May 25, 2000, Plaintiff underwent a CT scan of her head for her complaints of headaches. The CT scan was negative (R. 352).

On June 12, 2000, Plaintiff reported to PA-C Baker that she continued to experience pain in her neck and arms, which was minimally relieved by Talwin and Relafen. PA-C Baker observed Plaintiff experienced pain with flexion and extension of her right arm and right leg pain. Plaintiff's range of motion of her back was reduced (R. 436). He diagnosed low back pain and provided samples of Zoloft, Nasonex and Claritin (R. 435).

On July 3, 2000, Plaintiff was examined by Dr. Seen, who observed her as anxious and depressed. Plaintiff informed Dr. Seen she continued to smoke, Talwin caused nausea, and Elavil helped her sleep. He opined she had full range of motion of her upper extremities, with pain, and numerous trigger points. Additionally, Plaintiff was positive for diffuse wheezes. Dr. Seen diagnosed anxiety and depression, "some of which [was] situational," and COPD. He provided Plaintiff samples of Asthmacort, Claritin, and Flonase (R. 434).

On July 20, 2000, Plaintiff presented to Augusta B. Kosowicz, PA-C, at Family Health Care, with cough and chest and sinus congestion. She was diagnosed with bronchitis and prescribed

Zithromax and Proventil (R. 433).

On July 27, 2000, Hugh M. Brown, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 357, 364). Dr. Brown found Plaintiff had no exertional, postural, manipulative, visual or communicative limitations (R. 358-61). Dr. Brown opined Plaintiff should avoid concentrated exposure to hazards (R. 361).

On August 10, 2000, Plaintiff presented to Dr. Seen with a "frequent cough and dyspnea." Dr. Seen found Plaintiff had full range of motion of her neck, with pain, and her lungs were positive for diffuse wheezes (R. 432). Dr. Seen diagnosed asthmatic bronchitis, neck and back pain, and situational stressors. He prescribed Albuterol nebulizer, Celestone, and Combivent. He instructed Plaintiff to return in three months (R. 431-32).

On August 21, 2000, Dr. Seen wrote that Plaintiff could not work due to disc disease with pain (R. 430).

An August 31, 2000, chest x-ray was normal (R. 366).

On September 1, 2000, William Fremouw, Ph.D., conducted a Mental Status Examination of Plaintiff. Plaintiff "walked very stiffly, never smiled, moved slowly, and talked slowly." Plaintiff drove seventy miles to the appointment. Plaintiff stated she had "'disc deterioration, emotional stress problems, chronic bronchitis, arthritis, pain in [her] back, legs, and numbness.'" Plaintiff informed Dr. Fremouw that she cared for her mother, who had Alzheimer's Disease, and that her mentally disabled brother lived in the home with them (R. 369). Plaintiff informed Dr. Fremouw that she received assistance with the care of her mother from home health care and one sister. Plaintiff stated she had quit her job on December 12, 1999, due to leg pain and her caring for her mother, which " was producing stress." Plaintiff stated she experienced chronic pain, numbness in

her limbs, variable sleep, weight loss, fluid retention, frequent crying, no energy, a "down" mood, and thoughts of suicide. Plaintiff had no phobias, PTSD, or panic disorders. Plaintiff rated her pain as five on a scale of one to ten (R. 370).

Dr. Fremouw found the following: Plaintiff appeared tired; her speech was halting; she was oriented times four; her affect was restricted and flat; her thought processes were logical and coherent; her thought content was absent delusions of persecution or grandiosity, but she felt overwhelmed; her perception was absent hallucinations or illusions; her judgment was normal; her recent, remote, and immediate memories were normal; her concentration was mildly impaired; and her psychomotor was normal (R. 371). Dr. Fremouw diagnosed the following: Axis I – major depression, single episode, mild; Axis II – no diagnosis; and Axis III – COPD, arthritis, and degenerative disc disease (R. 372).

Plaintiff listed the following activities of daily living: rose between 4:00 a.m. and 7:00 a.m.; "trie[d] to do some housework;" fed her mother; helped her mother dress; shopped for groceries; visited the doctor; prepared light meals; drove; and retired between 11:00 p.m. and 3:00 a.m. Plaintiff stated she felt "trapped" in her home, but she did "not like to be around other people." Plaintiff did not hold membership in any club or church. Plaintiff visited with relatives when they came to visit her mother (R. 372).

On September 12, 2000, a state-agency physician completed a Psychiatric Review Technique of Plaintiff. Plaintiff was found to have an impairment that was severe, but not expected to last for twelve months; specifically, Plaintiff was found to have affective disorder and anxiety related disorder (R. 373). Plaintiff's affective disorder was caused by major depression, single episode, mild (R. 376). Plaintiff was found to have a slight degree of limitation in her activities of daily living, in

her ability to maintain social functioning, and relative to concentration, persistence, or pace. Plaintiff was found to have never experienced an episode of deterioration or decompensation (R. 380).

On October 9, 2000, Plaintiff underwent a ventilatory function test, which revealed "normal pulmonary function" (R. 382).

On October 16, 2000, Plaintiff reported to PA-C Baker with swelling, pain, and cough. He diagnosed abdominal edema, chronic disc disease, and bronchitis. PA-C Baker prescribed Lasix, Lortab, Levaquin, Protoxin, and Valium (R. 429).

On October 23, 2000, Dr. Brown completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 385, 392). Dr. Brown found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push/pull unlimited (R. 386). Dr. Brown found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 386-89).

On November 2, 2000, Plaintiff presented to Dr. Seen for a regular physical examination and with complaints of back and neck pain. Plaintiff reported Zoloft caused her to gain weight but "help[ed]" with her depression. Dr. Seen observed limited range of motion in Plaintiff's shoulders, which was secondary to pain, and neck spasm. He diagnosed chronic disc disease, anxiety, depression, and noted Plaintiff continued to smoke. Dr. Seen discontinued Zoloft and prescribed Wellbutrin. He also prescribed OxyContin and provided samples of Nasonex and Flovent and a coupon for Claritin to Plaintiff (R. 428).

On December 8, 2000, Plaintiff returned to Dr. Seen with complaints of pain and depression. Plaintiff reported her shortness of breath was relieved with Albuterol and her neck and back pain

continued. Dr. Seen noted Plaintiff's affect was depressed, she had full range of motion of her neck, limited range of motion of her back, and her strength was normal in her upper and lower extremities. Dr. Seen diagnosed chronic back pain, neck pain, and decreased sensation in her left leg below her knee. Dr. Seen continued Plaintiff's medications and provided Plaintiff with Flovent (R. 427)

Plaintiff returned to PA-C Baker on January 11, 2001, with complaints of leg numbness, neck pain, and arm pain (R. 426). PA-C Baker opined Plaintiff was in no acute distress, not "particularly energetic," alert and oriented, tearful, and dismayed. PA-C Baker diagnosed chronic pain and depression, "at least in part situational." He prescribed Prozac and Cipro and provided Plaintiff samples of Claritin and Relafen (R. 425).

On February 8, 2001, Plaintiff was examined by Dr. Seen for complaints of prolonged chest pains and diffuse muscle pain "aggravated by stress and lifting." Dr. Seen noted Plaintiff's affect was depressed. He also noted that Plaintiff cared for her mother who had Alzheimer's and required "total care." Dr. Seen found tenderness in Plaintiff's upper and lower extremities and in her thoracic and lumbar regions; however, Plaintiff had full range of motion in her extremities. Dr. Seen diagnosed chronic pain, "question not secondary to depression vs. fibromyalgia." Plaintiff's EKG was normal. Dr. Seen prescribed Lortab and OxyContin (R. 424).

On May 4, 2001, Plaintiff presented to Dr. Seen for her regular checkup. Plaintiff reported she had had a fever for three weeks, sore throat, and "pain all over." Plaintiff reported "weak grips" in her hands. Plaintiff informed Dr. Seen she had not taken OxyContin or Wellbutrin as prescribed because she exhausted her supply. Plaintiff stated she continued to smoke one package of cigarettes per day. Dr. Seen noted Plaintiff's affect appeared depressed, her neck was supple, she had spasm and tenderness in her thoracic lumbar muscles, her gait was normal, her sensation was intact, and

her range of motion was full in her shoulders. Dr. Seen diagnosed fibromyalgia, depression, and allergic rhinitis. He continued Plaintiff on her medications (R. 422).

On May 18, 2001, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 394, 401). He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday and push/pull unlimited (R. 395). Dr. Franyutti found Plaintiff was frequently limited in her ability to balance, kneel, crouch, and crawl. Dr. Franyutti found Plaintiff was occasionally limited in her ability to climb and stoop (R. 396). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 397-98). Dr. Franyutti found Plaintiff's exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation was unlimited. Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and hazards (R. 398). Dr. Franyutti reduced Plaintiff's RFC to sedentary, "because of pain" (R. 399).

On May 22, 2001, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had an impairment, depression, which was not severe (R. 403, 406). He found Plaintiff had a mild degree of limitation in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace. Dr. Roman found Plaintiff had experienced no episodes of decompensation (R. 413).

On June 29, 2001, Plaintiff presented to Dr. Seen with pain in her neck and low back, "worsening numbness in the anterior thighs," and burning and shooting pain to her big toes. He observed full range of motion in Plaintiff's neck, with tenderness; diminished sensation to her right hand; weak right hand grip; normal shoulder and elbow testing, but with pain; low back tenderness

20

to palpation; decreased thigh and foot sensation, bilaterally; and straight leg raising test that produced pain (R. 420). Dr. Seen diagnosed degenerative disc disease of the cervical and lumbar spine, paresthesias/dysesthesias of lower extremities, and depression with situational stressors. He prescribed OxyContin and provided samples of Wellbutrin to Plaintiff (R. 419).

On August 15, 2001, Plaintiff presented to Dr. Seen with complaints of "pain and burning down the lateral aspects of both legs." Dr. Seen noted "[Plaintiff's] financial constraints do not allow MIR [sic], surgical referral, or physical therapy at this time." Dr. Seen observed spasm in Plaintiff's lumbar paraspinal muscles and diminished sensation to light touch over Plaintiff's lateral aspects of both feet. Dr. Seen diagnosed degenerative disc disease of the cervical and lumbar spine, paresthesias and dysesthesias of lower extremities, and depression. Dr. Seen prescribed Percocet, Wellbutrin, Elavil, and Flovent (R. 417).

On October 8, 2001, Plaintiff presented to George Zakaib, M.D., with a sprained right wrist, which was a result of her "putting [a] baby in car seat" (R. 453, 456-57). Plaintiff reported she went to the emergency room for treatment, was informed her wrist was fractured, and purchased a "splint at the drug store." Dr. Zakaib noted Plaintiff "hyperventilate[d], swivel[led] her head and roll[ed] her eyes back and complain[ed] of all her problems." Dr. Zakaib instructed Plaintiff to continue wearing the splint and report to physical therapy (R. 453).

On October 17, 2001, Plaintiff reported to Chad Kucheraway, a physical therapist, for treatment of a sprained (not broken) right wrist (R. 450).

On October 26, 2001, Plaintiff presented to Dr. Seen with complaints of right wrist pain and neck pain. Dr. Seen diagnosed COPD, recent wrist injury, and cervical disc disease. He noted Plaintiff continued to smoke. Dr. Seen continued Plaintiff's medications. Plaintiff stated Percocet

"work[ed] as well as the OxyContin did in the past" (R. 449).

On November 7, 2001, Plaintiff returned to Dr. Zakaib for treatment of her sprained right wrist. He opined Plaintiff had reduced palmar flexion, her dorsiflexion was fifty degrees, and her forearm had full rotation. There was no swelling or bruising. Her grip strength and sensation were good. Dr. Zakaib diagnosed "[h]ealing ulnar wrist sprain" (R. 453).

Plaintiff presented to Dr. Seen on December 26, 2001, with complaints of "increasing pain in the neck w/increasing swelling" and that her lipoma was "getting bigger." Dr. Seen diagnosed Plaintiff with COPD and noted her persistent smoking. He also diagnosed lipoma, anxiety, and depression. Dr. Seen prescribed Combivent and Celexa. Dr. Seen noted Plaintiff did not "desire neurology evaluation at [that] time" (R. 464).

On February 21, 2002, Plaintiff was evaluated by Pedro F. Lo., M.D., for a mass at the nape of her neck, which he excised under local anaesthetic (R. 473-75). The laboratory results identified the mass as a lipoma (R. 476).

On February 25 and 26, 2002, Plaintiff underwent a psychological evaluation at Cardinal Psychological Services, upon referral by her Social Security Disability lawyer. Wilda Posey, M.A. and L. Andrew Steward, Ph.D. completed the evaluation. Plaintiff's presenting problems were: 1) she was "filing for Social Security Disability due to, '[her] back;'" disc degeneration; numbness of legs, arms, and hands; asthmatic bronchitis; COPD; allergies; nerve radiopathy; severe chest pains; angina; fibromyalgia; depression; anxiety; musculoskeletal problems; tremors and shaking; jerks; severe headaches; arthritis; multiple personality disorder (three personalities); paranoid thinking; psychic abilities; and sleeping disorder (R. 479-80). Plaintiff stated she was aggravated due to her having "to fight and go through so much hell to get Social Security, which is basically my money

that was taken from me each payday" (R. 480). Dr. Steward and Ms. Posey reviewed Plaintiff's medical records from 1983 to December, 2001 (R. 480-85). Plaintiff stated she had been examined by "numerous psychiatrists and psychologists and numerous counselors" and reported she did not "need counseling" (R. 485). Plaintiff informed the evaluators that she was being treated for anxiety and depression by her family physician. Plaintiff stated she knew when "the 'other personality' was in control." Plaintiff reported her "father was abusive to her" when she was a child and "she had been sexually abused by an uncle." Plaintiff stated she had experienced emotional problems as a child (R. 486).

Plaintiff's reported her activities of daily living included: varied rising and retiring times; constant nightmares; difficulty sleeping; varied appetite; watching television; cooking; and doing housework with her brother, who lived with her. Plaintiff stated she did not read, did not drive very much, and disliked shopping (R. 487). Ms. Posey and Dr. Steward found Plaintiff's eye contact was poor; she was polite and cooperative; she was withdrawn; she was alert and attentive; she was oriented in three spheres; her mood was depressed; her affect was flat and restricted; her thought processes were normal; her emotional insight was poor; her judgment was average; her remote memory was mildly deficient; her immediate and recent memories were normal; she had suicidal thoughts; she reported one suicide attempt; and her comprehension was average. As scored on the WAIS-III, Plaintiff's Verbal IQ was 90, her performance IQ was 79, and her Full Scale IQ was 84 (R. 488). Plaintiff scored at post-high school in reading, high school in spelling, and sixth grade in arithmetic on the WRAT-3. Plaintiff's score on the Beck Depression Inventory indicated severe depression and her score on the Beck Anxiety Inventory indicated severe anxiety (R. 490). Dr. Steward and Ms. Posey found the following: Axis I – major depressive disorder, moderate with

psychotic features, and generalized anxiety disorder; Axis II – diagnosis deferred, "but features of Schizoid Personality Disorder;" Axis III – reported COPD, angina, depression, anxiety, fibromyalgia, arthritis, and chronic asthmatic bronchitis; Axis IV – "loss of a loved one and lack of emotional support;" and Axis V – current GAF of fifty-two (R. 490-91). Ms. Posey and Dr. Steward found Plaintiff intellectual functioning was in the low-average range, there was no indication of organic brain dysfunction, her judgment was average, and there was a discrepancy between her former IQ scores and the scores she attained on their testing (R. 491).

On February 27, 2002, Plaintiff returned to Dr. Seen. She reported she was going to be treated by a neurosurgeon. She stated she experienced chest pain. Plaintiff informed Dr. Seen her mother had died and that she was "doing well." Dr. Seen diagnosed atypical chest pain, fibromyalgia, and rhinitis. He continued Plaintiff on her prescribed medications, reducing her dosage of Percocet to 10mg (R. 511).

On March 5, 2002, Dr. Steward and Ms. Posey completed a Psychiatric Review Technique of Plaintiff. The assessment was "from 12-17-99 to present." They did not find any medical dispositions, but noted Plaintiff was positive for affective disorders and anxiety disorders (R. 493). Plaintiff's affective disorder was depressive syndrome, which was characterized by the presence of anhedonia, change in appetite, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, thoughts of suicide, or hallucinations, delusions or paranoia (R. 496). Plaintiff's anxiety related disorder manifested itself in autonomic hyperactivity, vigilance, scanning, and a "persistent irrational fear of a specific object, activity or situation, which result[ed] in a compelling desire to avoid the dreaded object, activity, or situation" (R. 498). Ms. Posey and Dr. Steward found Plaintiff had a marked limitation of her

activities of daily living, a moderate limitation in her ability to maintain social functioning, and a marked limitation in her ability to maintain concentration, persistence, or pace. They also found Plaintiff had experienced three repeated episodes of decompensation (R. 503).

Also on March 5, 2002, Dr. Steward and Ms. Posey completed a Mental Residual Functional Capacity Assessment of Plaintiff. They found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. They found Plaintiff was moderately limited in her ability to understand and remember detailed instructions (R. 507). Dr. Steward and Ms. Posey found Plaintiff was not significantly limited in the following abilities: carry out very short and simple instructions; sustain an ordinary routine without special supervision; and make simple work-related decisions. They found Plaintiff was moderately limited in the following abilities: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and work in coordination with or proximity to others without being distracted by them. Plaintiff was found to be markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 507-08). Dr. Steward and Ms. Posey found Plaintiff was not significantly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. They found Plaintiff was moderately limited in her ability to interact appropriately with the general public; ask simple questions or request assistance; and accept instructions and respond appropriately to criticism from supervisors. The evaluators found Plaintiff was markedly limited in her ability to get along with coworkers or peers without distracting them

or exhibiting behavioral extremes. Plaintiff was found to be moderately limited in her ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. Plaintiff was found to be markedly limited in her ability to set realistic goals or make plans independently of others (R. 508).

On March 21, 2002, the ALJ conducted an administrative hearing relative to Plaintiff's SSI and DIB applications (R. 554-612).

## Evidence Missing from Transcript Supplied by Plaintiff to Court

Plaintiff submitted evidence including records from Central West Virginia Aging Services, Inc., dated 5/14/2000 -12/10/2001, establishing a plan of home health care for Plaintiff's mother; two letters from Plaintiff's sister referring to the help Plaintiff needed in caring for their mother, grandfather, and retarded brother; one letter from Plaintiff's sister regarding how Plaintiff's wrist was injured when she reached into the car to fasten her nephew into his car seat and he "jumped backwards pinning her wrist between him and the car seat;" and a March 12, 2002, report of a dual isotope nuclear stress test Plaintiff underwent, which was normal, showing good LV function, and no evidence of ischemia or previous myocardial infarction (Docket Entry 19).

## Evidence Submitted to the Appeals Council

On March 29, 2002, Plaintiff presented to Dr. Seen with complaints of increased pain. Plaintiff stated she had re-injured her wrist. She reported increased use of Percocet and inquired about his increasing her Duragesic dosage. Dr. Seen's examination of Plaintiff revealed she had "numerous trigger points" and was "exquisitely tender over the extensor tendon in the wrist." Dr. Seen diagnosed GERD, fibromyalgia, and wrist strain. He increased Plaintiff's dosage of Duragesic,

prescribed Percocet, and provided samples of Clarinex and Nasocort (R. 532).

On May 6, 2002, Plaintiff reported to Dr. Seen that she had been packing up her recently deceased mother's belongings and performing yard work. Plaintiff stated she "hurt[] all over and [did] move with some difficulty." Plaintiff reported that her dosage of Duragesic in "combination . . . [with] other pain medications" gave her "the most relief to date." Plaintiff continued to smoke one package of cigarettes per day. Dr. Seen noted Plaintiff's affect was depressed, she moved slowly, and she appeared to experience discomfort due to pain. Dr. Seen observed diffuse tenderness to superficial palpation in all muscle groups. He found "discrete spasm . . . [at] lumbar paraspinal muscles." Dr. Seen opined Plaintiff had full range of motion of her upper and lower extremities. He noted Plaintiff had a ganglion cyst on her posterior right hand and one on her posterior left hand, but no "obvious rheumatoid nodules." Dr. Seen's assessment was for "health maintenance," fibromyalgia, arthritis, "H/o kidney stones," depression, and "H/o lipoma neck" (R. 533). He advised Plaintiff to cease smoking and to exercise regularly. He ordered a rheumatoid profile; refilled Percocet, Valium, and Elavil prescriptions; provided Celexa and Nasocort samples; and ordered an x-ray of Plaintiff's hands. Dr. Seen also noted he would write a letter to Plaintiff "expressing [his] concern of continuing to prescribe medication w/o laboratory intervention," as he had received Plaintiff's lab chart noting she "had stopped by the lab and told them she did not want the labs done and left w/o lab work being done" (R. 534).

On July 1, 2002, Plaintiff presented to Dr. Seen with complaints of "pain . . . all over" and depression. She informed Dr. Seen that Duragesic and Percocet helped ease her pain. Dr. Seen noted Plaintiff "seem[ed] to be quite discouraged secondary to Social Security rejection." He observed "diffuse tenderness to superficial palpation," but full range of motion of her upper and

27

lower extremities. Dr. Seen diagnosed fibromyalgia with pain. He refilled Plaintiff's prescription for Duragesic and increased her Celexa dosage (R. 535).

On September 25, 2002, Plaintiff was evaluated by Dr. Seen, who noted Plaintiff "seem[ed] to be quite distraught secondary to upcoming review for disability and apparently has been denied Social Security benefits." Plaintiff requested a psychological referral for her depression. Plaintiff reported neck and right shoulder pain and numbness in her hands. Plaintiff stated she was wearing "carpal tunnel splints," which "seem[ed] to help." Dr. Seen observed "diffuse tenderness in multiple spots throughout the back and anterior chest wall," limited right shoulder range of motion, neck pain, and negative Tinel's and Phalen's signs (R. 536). Dr. Seen diagnosed fibromyalgia, depression with anxiety, "C/o paresthesia," and rhinitis. Dr. Seen scheduled Plaintiff for an EMG and referred her for psychological services, as per her request.

On October 3, 2002, Janice Blake, M.A., and John J. Kampsnider, Ph.D., completed a psychological "interview" of Plaintiff. They noted Plaintiff was referred to them by Dr. Seen after Plaintiff requested a psychological evaluation "secondary to increasing depression in part due to pain" (R. 536). She told them her family had taken her away "to the family camp for a couple of months, but [that] still did not help."

Psychologists Blake and Kampsnider reported that Plaintiff was referred due to depressive disorder with psychotic features, severe pain, and the recent death of her mother. Plaintiff reported "loss of interest, irritability, lack of sex drive, distractability, poor memory and concentration, nightmares, . . . feeling overwhelmed . . ., [and] feelings of helplessness, hopelessness, and worthlessness." Plaintiff stated she did not want to be "around people;" however, it was noted she lived with her ex-husband and her mentally delayed brother. Plaintiff "reported psychotic features"

28

in that she stated she believed "her house [was] haunted and that she hear[d] and [saw] spirits in the house." Plaintiff stated she feared "hurting others and herself." Plaintiff informed the interviewers that she felt "other people live[d] within her" and she believed she had multiple personalities. Plaintiff stated she "had been rejected by her parents and raised by an Aunt" (R. 538). Plaintiff stated that when she had lived with her grandmother, she had been sexually molested by her uncle and was experiencing flashbacks of the abuse (R. 539).

Plaintiff stated she had been recently diagnosed with fibromyalgia and arthritis, was in constant pain, her buttocks hurt, and she had numbness in her legs. Plaintiff was "unable or unwilling to give further information concerning her surgery or dates of diagnoses." Plaintiff drove 25 miles to the interview, was dressed in clean, casual clothes, and had poor overall hygiene. Plaintiff was friendly and cooperative, her speech was relevant and coherent, her ability to communicate was average, she presented no psychomotor difficulties, her anxiety level was appropriate, her affect was constricted, her mood was depressed, and her intelligence appeared to be in the low average range. Plaintiff's immediate memory was intact; "however, delayed memory functions appeared markedly impaired based on the [Plaintiff's] ability to recall personal historical data." Plaintiff's stream of thought was logical, sequential, and coherent. She possessed no excessive obsessions, compulsions, or phobias. Plaintiff reported both auditory and visual hallucinations in that she stated she could see and hear ghosts in her home. Plaintiff stated she "felt somebody else [was] in [her] head." She reported homicidal and suicidal ideations with no plan. Her Beck Depression Inventory scores were in the severe range of depressive symptoms (R. 539).

Ms. Blake and Dr. Kampsnider found the following: Axis I – major depressive disorder, recurrent, severe with psychotic features, and rule out posttraumatic stress disorder; Axis II –

diagnosis deferred; Axis III – arthritis, fibromyalgia, chronic pain by self report; Axis IV – problems in primary support group in the form of lack of support from family members, primary care of mentally disabled sibling, and no income; Axis V – GAF was fifty. Ms. Blake and Dr. Kampsnider recommended weekly psychotherapy, contact between Plaintiff's therapist and Dr. Seen, and referral to a psychiatrist if Plaintiff's symptoms "continue[d] with consistent services" (R. 540).

On October 4, 2002, Dr. Seen referred Plaintiff for an EMG. The impression was for "electrodiagnostic evidence for bilateral moderate carpal tunnel syndrome" and "no definite electrodiagnostic evidence for cervical radiculopathy" (R. 530).

Plaintiff was seen by Ms. Blake and Dr. Kampsnider at Psych Services Associates, Inc., on October 17 and October 29, 2002 (R. 546).

On November 8, 2002, Dr. Seen wrote a letter to Plaintiff's lawyer, which he noted would "serve as [her] request for summary report on" Plaintiff. He recounted his treatment of Plaintiff, which began in March, 2000, for a "knot in the left neck area," headaches, numbness, and right arm weakness. Dr. Seen noted that the MRI of Plaintiff's cervical spine, x-ray of Plaintiff's cervical spine, and x-ray of her chest were all normal. Dr. Seen wrote that in April, 2000, he prescribed Relafen and provided trigger point injections to Plaintiff for pain treatment. He noted Plaintiff presented with "poor sleep, worsening leg pain and asthma and allergy related symptoms" in May, 2000. He prescribed Zoloft, Talwin, and Tegretol. In June, 2000, Plaintiff reported improvement of her symptoms with Tegretol. Plaintiff was positive for wheezing in all lung fields (R. 541). Dr. Seen informed counsel that Plaintiff's complaints of fatigue, shortness of breath, and pain continued into the year 2001. His February 2002 evaluation of Plaintiff revealed her continued back pain, intermittent sharp chest pain, and "diffuse muscle pain and easy fatigability consistent with

fibromyalgia." By September, 2002, Plaintiff's pain had increased (R. 542). He opined Plaintiff was "significantly disabled and unable to perform any work related activities." He wrote Plaintiff "suffer[ed] from pain in the cervical and lumbar spine as well as in the right shoulder," which may be "attributed to her carpal tunnel syndrome." He wrote Plaintiff experienced depression and anxiety and her "other debilitating conditions include[d] . . . asthma and fibromyalgia." He wrote Plaintiff's fibromyalgia was "crippling, deforming or degenerative," which precluded her form working "in any capacity." Dr. Seen informed counsel that Plaintiff had reported to him she "had difficulty attending to her activities of daily living" (R. 542).

Plaintiff was treated by Ms. Blake and Dr. Kampsnider on January 6, 2003. It was noted Plaintiff made good eye contact, her mood was depressed, and "[s]ome improvement [had] been noted since the beginning of services" (R. 547).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Slahta made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.     The claimant has the following residual functional capacity: can perform light work activities with a sit/stand option with no repetitive bending or overhead reaching. She can perform entry level, unskilled, routine/repetitive, one-two steps tasks. She should work with things rather than people in a controlled clean air environment. She should have no exposure to hazards such as unprotected heights and dangerous moving machinery and, she can do no climbing.

8.     The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9.     The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

10.     The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

11.     The claimant has no transferable skills from skilled work previously performed as described in the body of the decision (20 CFR §§ 404.1568 and 416.968).

12.     The claimant has the residual functional capacity to perform a significant range of light or sedentary work (20 CFR § 416.967).

13.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include light work as a flat work tier with 70,000 jobs nationally and 1000 jobs regionally; as a folder with 75,000 jobs nationally and 1000 jobs regionally; and as an assembler of printed products with 80,000 jobs nationally and 700 jobs regionally. Even in the event that the claimant could not perform the above light jobs, using Medical-Vocational Rule 201.21 as a framework she could perform sedentary jobs such as a surveillance system monitor with 4000 jobs regionally and 200,000 jobs nationally; as a type copy examiner with 850 jobs regionally and 90,000 jobs nationally; and as a document preparer with 800 jobs regionally and 60,00 [sic] jobs nationally.

14.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)) (R. 32-34).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1.      The ALJ failed to conduct an appropriate evaluation of listed impairments and abused his discretion in failing to call a medical expert.

3.[sic]  The Appeals Council accepted evidence which was new and material, and failed to review the case, or even to comment upon much of the new evidence, which demonstrated that the decision of the ALJ was not supported by substantial evidence.

4.[sic]  The ALJ failed to first make specific findings on a function by function basis before

arriving at the mental RFC, which robs the RFC of substantial evidentiary support.

The Commissioner contends:

1.       Substantial evidence supports the ALJ's residual functional capacity assessment.
      A.       Substantial evidence supports the physical limitations.
      B.       Substantial evidence supports the mental limitations.
      C.       The ALJ's Step Three listing finding is supported by substantial evidence.

2.       The newly submitted evidence is not new and material evidence warranting a remand.

### C. Listed Impairments

Plaintiff first argues that the ALJ failed to conduct an appropriate evaluation of listed impairments and abused his discretion in failing to call a medical expert. She refers in particular to fibromyalgia. There is no listing for fibromyalgia. As the regulation provides, "in any case in which an individual has a medically determinable impairment that is not listed, an impairment that does not meet the requirements of a listing, or a combination of impairments no one of which meets the requirements of a listing, we will consider medical equivalence." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(H)(4). The ALJ found the most appropriate listing for evaluating Plaintiff's fibromyalgia was Listing 14.09, (inflammatory arthritis). Plaintiff herself particularly refers to Listing 14.09D. Listing 14.09 provides as follows:

> 14.09 *Inflammatory arthritis.* Documented as described in 14.00B6, with one of the following:
>
> 1. A. History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6b and 1.00B2b and B2c;
>
> or
>
> B. Ankylosing spondylitis or other spondyloarthropathy, with diagnosis established by findings of unilateral or bilateral sacroiliitis

34

(e.g., erosions or fusions), shown by appropriate medically acceptable imaging, with both:

1. History of back pain, tenderness, and stiffness, and

2. Findings on physical examination of ankylosis (fixation) of the dorsolumbar or cervical spine at 45° or more of flexion measured from the vertical position (zero degrees);

or

C. An impairment as described under the criteria in 14.02A.

or

D. Inflammatory arthritis, with signs of peripheral joint inflammation on current examination, but with lesser joint involvement than in A and lesser extra-articular features than in C, and:

1. Significant, documented constitutional symptoms and signs (e.g., fatigue, fever, malaise, weight loss), and

2. Involvement of two or more organs/body systems (**see 14.00B6d**). At least one of the organs/body systems must be involved to at least a moderate level of severity.

or

E. Inflammatory spondylitis or other inflammatory spondyloarthropathies, with lesser deformity than in B and lesser extra-articular features than in C, with signs of unilateral or bilateral sacroiliitis on appropriate medically acceptable imaging; and with the extra-articular features described in 14.09D.

(Emphasis added). 14.00B6d further provides:

d. As in 14.02 through 14.06, extra-articular features of an inflammatory arthritis may satisfy the criteria for a listing in an involved extra-articular body system. Such impairments may be found to meet a criterion of 14.09C. Extra-articular impairments of lesser severity should be evaluated under 14.09D and 14.09E. Commonly occurring extra-articular impairments include keratoconjunctivitis sicca, uveitis, iridocyclitis, pleuritis, pulmonary fibrosis or nodules, restrictive lung disease, pericarditis, myocarditis, cardiac arrhythmias, aortic valve insufficiency, coronary arteritis, Raynaud's phenomena, systemic vasculitis, amyloidosis of the kidney,

> chronic anemia, thrombocytopenia, hypersplenism with compromised
> immune competence (Felty's syndrome), peripheral neuropathy,
> radiculopathy, spinal cord or cauda equina compression with sensory
> and motor loss, and heel enthesopathy with functionally limiting pain.

The undersigned finds Plaintiff does not meet the requirement of "involvement of two or more organ body systems, . . . at least one of which must be involved to at least a moderate level of severity." Plaintiff argues that she "had mental impairment, a second body system listed in 14.02, supported by Dr. Seen's treatment records, the longitudinal record, and the report of psychologists . . . ." Listing 14.09, however, does not refer to 14.02, but to 14.00B6d. Plaintiff does not cite any case or law including a mental impairment as an "organ/body system" relative to listing 14.09 or 14.00B6d. There is therefore no evidence that Plaintiff's fibromyalgia involves "two or more organs/body systems," one of which must be of at least moderate severity. The undersigned therefore finds substantial evidence supports the ALJ's determination that Plaintiff does not meet or medically equal Listing 14.09.

Plaintiff also argues that the ALJ was required to obtain an updated medical expert opinion before a decision based on medical equivalence could be made, citing Social Security Ruling ("SSR") 96-6p, which provides, in pertinent part:

> The signature of a State agency medical or psychological consultant
> on an SSA-831-U5 (Disability Determination and Transmittal Form)
> or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of
> Disability or Blindness) ensures that consideration by a physician (or
> psychologist) designated by the Commissioner has been given to the
> question of medical equivalence at the initial and reconsideration
> levels of administrative review. Other documents, including the
> Psychiatric Review Technique Form and various other documents on
> which medical and psychological consultants may record their
> findings, may also ensure that this opinion has been obtained at the
> first two levels of administrative review.
>
> When an administrative law judge or the Appeals Council finds that

an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

> When an updated medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, the administrative law judge must call on a medical expert. When an updated medical judgment as to medical equivalence is required at the Appeals Council level in either of the circumstances above, the Appeals Council must call on the services of its medical support staff.

(Emphasis added). The case at bar does not meet any of the requirements of SSR 96-6p. Further, Plaintiff's reliance on SSR 99-2p, the listing for Chronic Fatigue Syndrome ("CFS") is misplaced. Although, as Plaintiff notes, footnote 3 to the Ruling refers to fibromyalgia, the entire footnote merely states:

> There is considerable overlap of symptoms between CFS and Fibromyalgia Syndrome (FMS), but individuals with CFS who have tender points have a medically determinable impairment. Individuals with impairments that fulfill the American College of Rheumatology criteria for FMS (which includes a minimum number of tender points) may also fulfill the criteria for CFS. However, individuals with CFS who do not have the specified number of tender points to establish FMS, will still be found to have a medically determinable

37

impairment.

The undersigned finds there was no requirement under either SSR 96-6p nor under 99-2p, nor generally, that the ALJ obtain a medical expert opinion in this case. The undersigned therefore finds substantial evidence supports the ALJ's determination that Plaintiff did not meet or medically equal a listed impairment.

### D. Evidence Before the Appeals Council

Plaintiff next argues: "The Appeals Council accepted evidence which was new and material, and failed to review the case, or even to comment upon much of the new evidence, which demonstrated that the decision of the ALJ was not supported by substantial evidence." (Plaintiff's brief at 14).

Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is not "new" if other evidence specifically addresses the issue. See Id. at 96.

Here the Appeals Council undisputedly considered evidence submitted by Plaintiff after the ALJ's decision of May15, 2002, including: a neurodiagnostic report dated October 4, 2002; a medication list dated September 16, 2002; office notes of Dr. Seen dated March 29, 2002- September 25, 2002; the Blake/Kampsnider psychological report dated October 3, 2002; a report from Dr. Seen dated November 8, 2002; and treatment summaries from psychologists Blake and Kampsnider dated October 2002 and January 2003 (R. 7). The Appeals Council also considered that Plaintiff had been

found disabled as of October 3, 2002, the date of the Blake/Kampsnider report. The Appeals Council, however, then found that the new evidence did not provide a basis for changing the ALJ's decision. The Appeals Council explained that the October 3, 2002, finding of disability was based on the Blake/Kampsnider psychological evaluation of that same date, but that there was no evidence to support a finding of disability prior to that date. The undersigned has reviewed the record as a whole, including the new evidence, pursuant to Wilkins v. Secretary, 953 F2d 93 (4th Cir. 1991).

Plaintiff in particular contends that the neurodiagnostic report "documenting bilateral carpal tunnel syndrome . . . pertained to symptoms present prior to the ALJ decision." Plaintiff argues that the ALJ did not include any limitations on the upper extremities in his RFC and this "should cause a remand." The undersigned does not agree. First, the neurodiagnostic report was dated October 4, 2002, seven months after the administrative hearing, and five months after the ALJ's decision. Second, the report states only: "There is electrodiagnostic evidence for bilateral moderate carpal tunnel syndrome." Even if this is considered an actual diagnosis, and not just "evidence of" carpal tunnel syndrome, a mere diagnosis of a condition is not enough to prove disability. There must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986). There is no diagnosis of carpal tunnel syndrome in the record prior to this date. Further, Plaintiff's Tinel's sign and Phalen's sign (both tests for carpal tunnel syndrome) were negative just prior to the neurodiagnostic testing. Although Plaintiff at times reported weak right hand grip the ALJ noted Dr. Zakaib found that her grip strength and sensation were good on November 7, 2001, only a few months prior to the administrative hearing.

The undersigned also notes that the same neurodiagnostic report states: "The EMG exam revealed no evidence of denervation. The patient did have total numbers which could be consistent

with deconditioning and/or decreased effort." (R. 530).

Finally, even if Plaintiff did have carpal tunnel syndrome at the relevant time, and even if it did cause functional limitations, the Vocational Expert testified that there would still be a significant number of jobs available in the national and regional economy. He testified that the light-duty jobs and the job of document preparer would be ruled out, but that would leave available the sedentary jobs of surveillance system monitor with 4000 jobs regionally and 200,000 jobs nationally, and type copy examiner with 850 jobs regionally and 90,000 jobs nationally. The undersigned finds these represent a significant number of jobs.

Plaintiff next argues that the psychological interview by psychologists Blake and Kampsnider "was substantially similar to the report of Posey and Stewart, and documented severe psychotic symptoms, long-standing, some originating in childhood." The undersigned understands that disability was awarded Plaintiff as of the date of Blake/Kampsnider report, but finds that substantial evidence supports the Appeals Council determination that this report and the award of benefits as of five months after the ALJ's decision would not have reasonably changed the ALJ's decision in this matter.

First, Plaintiff argues that the Blake/Kampsnider "interview" "was substantially similar to the report of Posey and Stewart, and documented "severe psychotic symptoms, long-standing, some originating in childhood." (Plaintiff's brief at 14.) The ALJ, however, noted Plaintiff's MMPI (personality test) profile was considered invalid by Posey and Stewart due to "the validity scales [being] elevated." (R. 490). The ALJ also noted this was the third MMPI profile that was considered invalid, all by different psychologists. The undersigned also notes that the only "tests" psychologists Blake and Kampsnider administered to Plaintiff were the Beck Depression Inventory and the Rotter

40

Incomplete Sentences Blank, both of which are subjective in nature, and therefore dependent on the test-taker's credibility.

Plaintiff told psychologists Posey and Stewart that she was aggravated due to having "to fight and go through so much hell to get Social Security, which is basically my money that was taken from me each payday" (R. 480). The ALJ correctly noted that at the February 2002 psychological evaluation (just one month before the scheduled hearing) Plaintiff for the first time reported having multiple personalities and psychic abilities. She told the psychologists she had been examined by "numerous psychiatrists and psychologists and numerous counselors" and reported she did not "'need counseling'" (R. 485). She stated she knew when "the 'other personality' was in control."

When asked at the administrative hearing why she never told the "numerous psychologists and numerous counselors"[2] she had seen previously about "things in that report that didn't show up anywhere in any of the other examinations that were done," Plaintiff testified: "Well, because I've told her [Ms. Blake] a couple things that I never told anyone else. I mean it was just - - she really - - I guess it was just really one of those bad, depressing days, it just kind of slipped out of my mouth before I thought." (R. 591). Plaintiff then testified:

> . . . . I used [to] think that I was maybe a little psychic, but maybe not.
> I'm not really psychic, but it's just like I see things sometimes. I
> missed - - you know, I get so tired of hearing people tell me that's
> stupid; they don't believe me. And I believe in - - everybody has their
> own beliefs, okay? I believe that - - you know, there is - - I believe -
> - I mean - - we always say that - - I believe that right now, in here in
> this room with us, that there is people standing beside of us. I believe
> in the supernatural. I'm maybe more acceptable [sic] to it, and yes,
> I have seen - - I have known when - - right before people have died
> before anybody's called and told me. I've have known when

_____

[2]Plaintiff reported to Dr. Fremouw in 2000, that she had "no history of counseling." (R. 370).

41

something has been going to happen. And yes, I have seen things. I've done that since I was a kid as far as seeing things. And I used to - - we used to - - you know, when you're a kid, you just kind of put it off to, well, the house is haunted.

Id.

Counsel asked Plaintiff if she had been embarrassed to talk to people about her psychic abilities and Plaintiff explained that she was not embarrassed, but she got tired of people saying, "well, you're crazy because you see things like this."

In addition to the new reports of hallucinations, psychic abilities, and multiple personalities, Plaintiff also told psychologists Posey and Steward that her father physically and emotionally abused her when she was a child; she had been sexually abused by an uncle; and she lived "a lot" with her aunt and grandmother.

Plaintiff argues her "severe psychotic symptoms" were "long-standing, some originating in childhood." Yet Dr. Wyatt found in 1991, that Plaintiff had no psychosis, delusions, hallucinations, or bizarre thoughts (R. 311). In January 1992, Dr. Weise found Plaintiff did not have any psychiatric impairment. In February 1992, she told Dr. Robertson that her childhood was "all right" and she was "not mistreated." (R. 324). She was "close to her mother" although her father was "aggravating." Dr. Robertson opined Plaintiff had no psychotic symptoms. In August 1992, Plaintiff told psychologist Smith that she had a "normal childhood without any abuse or neglect." (R. 328). In 2000, Dr. Fremouw found Plaintiff had no hallucinations or illusions and her judgment was normal.

In July 2002, two months after the ALJ's unfavorable decision, Plaintiff told her treating physician she was "quite discouraged secondary to Social Security rejection . . . ."(R. 535). She felt "more significantly depressed." Two months later, she "[s]eem[ed] to be quite distraught secondary to upcoming review for disability and had apparently just been denied Social Security benefits." She

requested "a psych referral secondary to increasing depression in part due to her pain." At that psychological interview, psychologists Blake and Kampsnider noted Plaintiff "referred herself for services on the advice of her physician" (R. 538). She now reported "psychotic features stating she believe[d] that her house is haunted and that she hears and sees spirits in the house." She reported a fear of hurting others and herself. She reported that she felt that other people lived within her, stating that she believed she had multiple personalities. She reported that on one occasion she dreamed she had been tied down by demons, and when she awoke she had bruises on her wrist and ankles and blood on herself that she could not explain. She also reported "she had been rejected by her parents and raised by an Aunt." She also reported having been sexually molested by an uncle "while she lived with her grandmother, and reported recent flashbacks of that abuse."

The undersigned finds substantial evidence supports the ALJ's determination regarding the Posey/Stewart evaluation in two ways: 1) Plaintiff's mother had died only approximately one month before that evaluation, which led to increased, temporary, depression; and 2) Plaintiff's own reports regarding her mental impairments and limitations were not credible. The undersigned also finds substantial evidence supports the Appeals Council's determination that the Blake/Kampsnider report would not have reasonably changed the ALJ's determination. There is some evidence that Plaintiff's mental impairments increased from the time of her mother's death, shortly before the administrative hearing, through the date of the Blake/Kampsnider "interview" many months later. Therefore even if this report does support a finding that Plaintiff was disabled as of October, there is still substantial support for the ALJ's determination that she was not disabled as of May 2002.

Additionally, the ALJ's determination regarding Plaintiff's credibility is entitled to great weight. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor

and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). The ALJ found Plaintiff's complaints about her mental impairments and limitations were not credible. The three invalid MMPI's, and the sudden change in reports of symptoms and reports of traumatizing life events substantially support the ALJ's determination in this regard. According to SSR 96-7p:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. **Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e)**. The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

> The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

(Emphasis added).

Additionally, there were several reports in the record, besides at least three separate invalid MMPI's, in which providers opined Plaintiff was at least exaggerating regarding her condition. In 1991, Dr. Weise found Plaintiff's subjective complaints exceeded and outweighed the objective findings. Her personality test result was invalid because she "responded to the test in an exaggerated fashion claiming symptoms and attitudes which do not correspond to known psychiatric conditions." He opined that Plaintiff exaggerated her symptoms and did not have a psychiatric impairment. He also noted that Plaintiff was observed getting out of her car and "had no problems with her gait," yet walked with a slight limp at the examination. In 1992, while Dr. Smith noted that test results revealed a strong indication of "an anxiety condition" and "a depressive condition," there was also "the possibility that [Plaintiff's] complaints are exaggerated or stress related rather than purely the result of physical health problems" (R. 335).

Based on all the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's statements regarding her impairments and limitations caused by those alleged impairments were not credible. The undersigned also finds substantial evidence supports the Appeals Council's determination that the new evidence would not reasonably have changed the ALJ's decision.

### E. Mental RFC

Plaintiff next argues that the ALJ "failed to make specific findings on a function by function

basis before arriving at the mental RFC, which robs the RFC of substantial evidentiary support."

Plaintiff cites SSR 96-8p, which provides, in pertinent part:

> When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

> RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*.

Plaintiff complains that the ALJ did not make findings "with regard to the specific functional limitations [contained in the Posey/Stewart assessment] prior to arriving at his RFC for simple, unskilled, routine, repetitive, etc. work. The failure to first make findings with regard to specific mental limitations robs his RFC of substantial evidentiary support."

The ALJ first found Plaintiff had depression and anxiety, severe impairments. He found the impairments satisfied the "A" criteria of the Listings, but did not satisfy the "B" or "C" requirements for disabling mental impairments. As the ALJ reported, the psychological and psychiatric evidence up until the year 2000, showed that Plaintiff had functioned well in her past jobs, both before and after her work-related injury. She had episodes of dysthymia, but had never had any regular mental health treatment or a mental condition that would prevent all work activity.

Plaintiff was evaluated by Dr. Fremouw in September 2000. He gave her a diagnosis of major depression, single episode, mild. The ALJ accorded great weight to Dr. Fremouw's opinion, which showed that Plaintiff, despite her situational pressures, was still able to function at a high level

46

of activity.

On September 12, 2000, a state-agency physician completed a Psychiatric Review Technique of Plaintiff. Plaintiff was found to have an impairment that was severe, but not expected to last for twelve months; specifically, Plaintiff was found to have affective disorder and anxiety related disorder (R. 373). Plaintiff's affective disorder was caused by major depression, single episode, mild (R. 376). Plaintiff was found to have a slight degree of limitation in her activities of daily living, in her ability to maintain social functioning, and relative to concentration, persistence, or pace. Plaintiff was found to have never experienced an episode of deterioration or decompensation (R. 380).

On May 22, 2001, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had an impairment, which was not severe (R. 403). Dr. Roman found Plaintiff had depression, an affective disorder (R. 406). Dr. Roman found Plaintiff had a mild degree of limitation in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace. Dr. Roman found Plaintiff had experienced no episodes of decompensation.

In February 2002, however, Ms. Posey and Dr. Steward found Plaintiff had a marked limitation of her activities of daily living, a moderate limitation in her ability to maintain social functioning, and a marked limitation in her ability to maintain concentration, persistence, or pace. They also found Plaintiff had experienced three repeated episodes of decompensation (R. 503).

As already discussed, the Blake/Stewart evaluation was given appropriate weight in light of the recent death of Plaintiff's mother, but the ALJ considered the lower GAF and some of the limitations only temporary. Additionally, as already discussed, Plaintiff's statements to the evaluators, along with an again invalid MMPI, raised questions about her credibility in reporting her

symptoms and limitations to those evaluators. The undersigned finds it follows that the credibility of Blake and Stewart's findings regarding Plaintiff's limitations is affected by the lack of credibility in Plaintiff's reports to them and on the multiple invalid personality tests.

Even where psychologists found Plaintiff had mental impairments prior to 2002, it was often described as "situational." For example, in April 2000, Plaintiff's treating physician's assistant diagnosed "depression due to psychosocial stressors." One month later, he diagnosed "situational depression." In July 2000, treating physician Seen diagnosed anxiety and depression, "some of which [was] situational." In August 2000, Dr. Seen diagnosed "situational stressors." In September 2000, Plaintiff told Dr. Fremouw she was taking care of her mother who was nonambulatory with Alzheimer's, and had become "increasingly distressed since feeling the responsibility." She reported to him that she quit her job in December 1999 because her legs were hurting and her mother was "producing stress." She reported she had been taking care of her mother full time since then. In January 2001, PA-C Baker diagnosed chronic pain and depression, "at least in part situational." In June 2001, Dr. Seen diagnosed depression with situational stressors. There is no evidence in the record of long-standing psychological impairments, especially psychosis.

The ALJ found Plaintiff's symptoms and limitations as reported to Posey/Stewart not entirely credible. Further, he found the symptoms and limitations she did have were temporary, since her mother had just died the week before, and Plaintiff had never even mentioned many of those symptoms before, even though she had been referred to a number of psychologists/psychiatrists as part of her workers' compensation claim. There is no evidence in the record that Plaintiff ever went to or requested counseling during the entire relevant time period. The ALJ accorded great weight to the opinion of Dr. Fremouw, who diagnosed Plaintiff with major depression, single episode, mild.

He especially noted that Plaintiff was functioning at a high level of activity despite a great deal of situational pressures, such as caring for her retarded adult brother, her grandfather, and her elderly mother who suffered from Alzheimer's disease.

Despite his finding that Plaintiff's alleged mental limitations were not credible, the ALJ limited her to entry level, unskilled, routine/repetitive, one-two step tasks primarily working with things rather than people. The undersigned finds substantial evidence supports the ALJ's determination that these limitations took into account all the functional limitations supported by the record.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 22]be **GRANTED,** and the Plaintiff's Motion for Summary Judgment [Docket Entry 17] be **DENIED,** and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn,

474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **22** day of January, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE